## A) COVER LETTER – JOINT SUBMISSION TO EUROPEAN, UK, AND US JURISDICTIONS

## Global Cross-Jurisdictional Action — Pierre Deglaire v. French State & Banks & Private Actors

**From:**
**Pierre Deglaire**
Independent Real-Estate and Financial Consultant
7 Rue Guillaume Apollinaire 33700 Mérignac France
pierre.deglaire@gmail.com
+33 6 63 90 13 01

**25 CV 10163**

**To :**
**Registry of the EUROPEAN COURT OF HUMAN RIGHTS – URGENT FILING (Rule 39)**

Registry of the European Court of Human Rights
1 Quai Ernest Bevin
67000 Strasbourg – France

**And**

**HIGH COURT OF JUSTICE – URGENT APPLICATIONS**

**King's Bench Division – Urgent Applications Court**
**The Rolls Building**
**7 Rolls Buildings, Fetter Lane**
**London EC4A 1NL – United Kingdom**

**And**

**UNITED STATES DISTRICT COURT – EMERGENCY FILINGS**

**U.S. District Court for the District of Columbia**
**333 Constitution Ave NW**
**Washington, DC 20001 – USA**

RECEIVED
SDNY PRO SE OFFICE
2025 DEC -8 PM 1:26

1

**Subject : Joint petition for registration and protective measures —
Reference ECHR No. 30346/25, A reference number (30346/25) was sent to
me by email, but given the proven interception of almost all my
communications, I cannot confirm the authenticity of this document.
Therefore, I respectfully request the Court to confirm whether this number
corresponds to an actual registered case, or whether my previous filings
were intercepted before reaching the Registry**

**Dear Registrars,**

Please find enclosed the complete petition file titled **"Global Cross-Jurisdictional Action —
Pierre Deglaire v. French State & Banks & Private Actors"**, submitted simultaneously
before:

1. The **European Court of Human Rights**,
2. The **High Court of Justice (King's Bench Division – Urgent Applications Court)**,
   and
3. The **U.S. District Court for the District of Columbia**.

This filing is made under **self-representation**, due to a total and documented obstruction of
access to legal counsel in France.
It is grounded on :

- **Articles 2, 3, 5, 6, 13 and 14 ECHR**,
- **Article 1 of Protocol 1**,
- **Articles 47–48 of the EU Charter**,
- **The Human Rights Act 1998 (UK)**,
- **U.S. constitutional due-process guarantees**, including the **right of access to the
  courts**.

Given the **triple nature of the case** — fundamental rights violations, coordinated economic
destruction, and systemic obstruction of judicial access — the Applicant respectfully requests:

## 1. Registration of the case in emergency procedure

(Urgent procedure / immediate judicial intervention).

## 2. Confirmation that adversarial defence rights for Respondents are suspended and irrevocably lost

until full access to justice is restored, in accordance with the doctrines of
**extraordinary circumstances**, **positive obligations**, and **right-to-life primacy**.

## 3. Transmission of this filing to the two sister jurisdictions

(UK ↔ US ↔ ECHR),
regardless of the Court where the Applicant physically files,
as **each court retains jurisdiction over non-overlapping segments of the harm**.

## 4. Immediate examination of the eight urgent measures requested, namely:

- Freezing injunction (€500M),
- Urgent €7M provision,
- Protection measures for the Applicant and his family,
- Preservation and secure retention of all institutional/banking data (without seizure motions),
- Restoration of access to justice,
- Recognition of transnational persecution,
- Judicial supervision of all counterparties,
- Authorization for simplified procedure due to obstruction.

The enclosed file contains the full factual chronology, legal analysis, jurisdictional bases, and financial assessment (global loss estimate €124.4B).
Additional annexes, certified copies, and supporting documents will be provided according to each Court's instructions.

The Applicant respectfully requests **written confirmation of registration**,
as well as any procedural adjustments or formal requirements deemed necessary.

**Respectfully submitted,**
**Pierre Deglaire**
Applicant – Self-represented

Independent Real-Estate and Financial Consultant
7 Rue Guillaume Apollinaire 33700 Mérignac France
pierre.deglaire@gmail.com
+33 6 63 90 13 01

**Executed in Mérignac (France), on 30 11 2025**

# TABLE OF CONTENTS SUMMARY — PRIORITY READING SECTIONS

## Introductory Note

This summary identifies the sections that allow a judge or registrar to understand the case efficiently and immediately.
These headings represent the core factual, legal, and economic elements required to assess jurisdiction, urgency, danger, obstruction, and damages.
The detailed Table of Contents appears on the next page.

---

## PRIORITY READING SECTIONS

1. B) Executive Summary — Urgent Synthesis of Facts, Danger, Obstruction, and Requests — *P7–P12*
2. C) 1) Recent Escalation and Immediate Personal Danger (Aug–Dec 2025) — *P13–P17*
3. C) 2) Systemic Obstruction of Justice (ECHR — UK — US) — *P18–P22*
4. C) 3) Legal Consequences and Urgent Requests for Protective Measures — *P23–P31*
5. G) 1) International Legal Core Submission — *P40–P45*
6. G) 3) Legal Demonstration of 100% Certain Loss (UK–US–ECHR Doctrine) — *P53–P55*
7. G) 4) Application of Law to the Facts — *P56–P62*
8. G) 5) Final Relief Sought — *P63–P68*
9. L) Economic Damage Assessment – Bank Lucy — *P188–P204*
10. M) Economic & Social Damage Assessment – Property Dismemberment — *P205–P213*

# TABLE OF CONTENTS

A) COVER LETTER – JOINT SUBMISSION TO EUROPEAN, UK, AND US
JURISDICTIONS                                                              P1-P3

TABLE OF CONTENTS SUMMARY                                                  P4

TABLE OF CONTENTS                                                          P5-P6

B) EXECUTIVE SUMMARY — URGENT SYNTHESIS OF FACTS, DANGER,
OBSTRUCTION, AND REQUESTS                                                  P7-P12

C) 1) RECENT ESCALATION AND IMMEDIATE PERSONAL DANGER (AUG–
DEC 2025)                                                                  P13- P17

C) 2) SYSTEMIC OBSTRUCTION OF JUSTICE (ECHR — UK HIGH COURT — US
DISTRICT COURT)                                                           P18-P22

C) 3) LEGAL CONSEQUENCES AND URGENT REQUESTS FOR PROTECTIVE
MEASURES                                                                   P23-P31

D) PRELIMINARY STATEMENT – SPECIAL CONDITIONS OF APPEARANCE
                                                                           P32-P35

E) PREAMBLE NOTE — EXCEPTIONAL NATURE OF THE CASE       P36-37

F) MULTI-JURISDICTIONAL HARM ALLOCATION AND ANTI-DUPLICATION
FRAMEWORK                                                                  P38-39

G) 1) INTERNATIONAL LEGAL CORE SUBMISSION                                  P40-P45

G) 2) LEGAL FOUNDATIONS (ECHR + UK + US) — FULL JURISPRUDENCE &
DOCTRINE                                                                   P46-P53

G) 3) LEGAL DEMONSTRATION OF 100% CERTAIN LOSS (UK-US-ECHR
DOCTRINE)                                                                  P53-P57

G) 4) APPLICATION OF LAW TO THE FACTS                                      P57-P62

G) 5) FINAL RELIEF SOUGHT                                                  P63-P68

G) 6) ANNEX— STATISTICAL IMPOSSIBILITY ANALYSIS                            P69-P72

H) EVIDENCE BLOCKS (FACTUAL + NARRATIVE) WEAPONS OF THE
SHADOW                                                                     P73-P168

I) EXECUTIVE SUMMARY – WEAPONS OF THE SHADOW                               P169-177

J) EMERGENCY FILING – TRI-JURISDICTIONAL SUBMISSION                        P178-184

K) ECONOMIC LOSS ASSESSMENT – DPP CONSULTING          P185-187

L) ECONOMIC DAMAGE ASSESSMENT – BANK LUCY             P188-204

M) ECONOMIC & SOCIAL DAMAGE ASSESSMENT – PROPERTY
DISMEMBERMENT                                         P205-213

N) ECONOMIC & SOCIAL DAMAGE ASSESSMENT – TINYMODELS
CONSTRUCTION & HOUSING PROJECT                        P214-220

O) MASS ECONOMIC DESTRUCTION & SOCIAL EXTINCTION OF VALUE
                                                     P221-P226

P) SYSTEMIC CRIME AGAINST AN ENTREPRENEUR            P227-P232

Q) STATEMENT OF FACTS                                P233-P254

R) CONCLUSION & EMERGENCY REQUESTS                   P255-p258

S) LIST OF COUNTERPARTIES – BANKING INSTITUTIONS     P259-P260

T) LIST OF RESPONDENT PARTIES – FRENCH STATE AND RESPONSIBLE
OFFICIALS                                            P261

U) COMPETENCE OF THE THREE COURTS SEIZED             P262-264

V) PERSONNAL PLEA                                    P265-P266

W) LIST OF EVIDENCE – INDICATIVE INVENTORY AND SUBMISSION
SCHEDULE                                             P267

X) INDEX OF ANNEXES                                  P268

Y) CLOSING NOTE                                      P269

Z) ANNEX                                             P270-321

# B) EXECUTIVE SUMMARY — URGENT SYNTHESIS OF FACTS, DANGER, OBSTRUCTION, AND REQUESTS

## B) 1) NATURE OF THE CASE — TEN YEARS OF EXTREME DANGER, SYSTEMIC OBSTRUCTION, AND MASSIVE ECONOMIC DESTRUCTION

This case unfolds **after ten years** of coordinated and escalating violations, including :

- **Unlawful international imprisonment (Serbia, 2022),**
- **Illegal psychiatric internment and forced sedation (France, 2022),**
- **Multiple poisoning attempts,**
- **Recurrent vehicle sabotage,**
- **Systematic interception of emails, LRAR, DHL deliveries, and phone communications,**
- **Manipulation of professional relationships and bank interventions,**
- **Destruction of all income sources and professional networks,**
- **Total collapse of access to justice in France and internationally.**

**These 2025 events are not an isolated spike — they are the continuation of ten consecutive years of lethal practices already applied against the Applicant (illegal imprisonment, forced psychiatric internment, poisonings, car sabotage).**

The events of August–December 2025 are not isolated: they represent the *latest layer* of a long-standing strategy of persecution aimed at :

1. **Endangering the Applicant's life,**
2. **Neutralising every judicial access point,**
3. **Eliminating economic existence** (current global loss: €124.4B).

For ten years, **every filing — email, LRAR, DHL, phone call, in-person request — has been intercepted or diverted.**
No functioning judicial doorway remains.

## B) 2) EXTREME AND IMMEDIATE DANGER TO LIFE (AUG–DEC 2025), IN CONTINUITY WITH TEN YEARS OF LETHAL ACTIONS

### B) 2) A) Geneva vehicle sabotage (high-lethality incident)

7

Shortly after filing attempts at the UN in Geneva, the Applicant's vehicle experienced a **sudden and abnormal total loss of adhesion**.
Thousands of kilometres before and after this incident were driven without recurrence.

The timing, method, and context confirm:

**This was an attempt to cause a fatal crash during an international legal action.**

## B) 2) B) Survival conditions and exhaustion protocol (5,000 km in 6 days)

To bypass interception of postal and electronic submissions, the Applicant was forced to drive :

- 5,000 km in 6 days,
- In winter conditions,
- With almost no sleep (6h in 72h),
- With a vehicle previously sabotaged,
- Without financial means or logistical support.

This extreme exhaustion is **engineered** and **cumulative**, not accidental.

## B) 2) C) Forced sleep in car (0°C–2°C)

Due to network shutdowns, inability to find hotels, and total loss of GPS:

- The Applicant slept in his car at near-freezing temperatures,
- After days without rest,
- Without the possibility to call for help.

This constitutes **deliberate life-endangerment**.

## B) 2) D) Imminent fuel depletion on motorway, with no phone and no GPS

A near-fatal scenario occurred where:

- No petrol station could be located,
- No GPS or phone worked,
- The Applicant risked being stranded on a foreign motorway at night,
- In freezing weather,
- Without the ability to contact emergency services.

## B) 2) E) Telecommunication shutdowns at critical moments

Network failures were not random; they were synchronised with:

- Judicial filings,
- International travel,
- Evidence preparation,
- And employer/bank interactions.

**B) 2) F) Legal qualification (balanced across ECHR, UK, US)**

**ECHR**

- Art. 2 — real and immediate threat to life
- Art. 3 — inhuman/degrading treatment
- Art. 6 + 13 — destruction of access to justice
- Art. 34 — obstruction of individual petition

**United Kingdom**

- **Osman Duty** – authorities' obligation to prevent known, immediate life risks
- **Constitutional Fairness Doctrine**
- **Abuse of Process**
- **CPR 25 emergency relief requirements**
- **Judicial review principles** (failure to act, bad faith interference)

**United States**

- **5th Amendment Due Process** — right of meaningful access
- **Rule 65 TRO criteria**
- **Bounds v. Smith** (access to courts)
- **Fed. R. Civ. P. 5(d)(4)** — filings cannot be refused
- **Extraordinary Circumstances Doctrine** (when foreign interference prevents access to court)

---

# B) 3) SYSTEMIC OBSTRUCTION OF JUSTICE ACROSS THREE JURISDICTIONS

For ten years, and especially in 2025 :

- **LRAR (registered letters)** repeatedly intercepted before reaching ECHR ;
- **DHL package** "delivered" to US District Court with no acknowledgement;
- **Emails** to all jurisdictions intercepted or erased;
- **Phone calls** filtered so responses cannot reach the Applicant;
- **Physical access** denied at ECHR ;
- **A fabricated/irregular "hearing"** staged in London ;
- **No jurisdiction** (ECHR, UK, or US) ever received filings in normal conditions.

The same pattern appears in all three jurisdictions:

**The Applicant is prevented from reaching any court capable of reviewing France's actions.**

This satisfies the criteria for :

- Rule 39 ECHR
- UK emergency applications
- US TRO / Preliminary Injunction
- International law on reprisals

---

# B) 4) FORFEITURE OF DEFENCE RIGHTS — FIRST AND CENTRAL LEGAL CONSEQUENCE

Where a State (or its coordinated actors) :

- Intercepts filings,
- Manipulates procedures,
- Blocks physical or electronic access to courts,
- Retaliates against the applicant,
- Or destroys adversarial balance,

it **forfeits its right to defend itself**.

This principle is recognised in :

- **ECHR** : Ilascu, Mamatkulov, Airey, Kolevi
- **UN CAT** : General Comment 4 (reprisals)
- **UK** : Constitutional fairness + Unclean Hands
- **US** : Equitable estoppel, Due Process, "no benefit from obstruction" doctrine

**Sentence to include verbatim**

**"A party that obstructs justice may not invoke the right to defend itself."**

**Procedural consequence**

The Court may immediately:

- Apply **accelerated procedure**,
- Decide **based solely on Applicant's evidence**,
- Deem the Respondent in **default caused by its own obstruction**,
- And order immediate protective measures **without adversarial hearing**.

---

# B) 5) EVIDENCE — FOCUSED STATEMENT OF CAPABILITIES AND PRESERVATION NEEDS

**All elements referenced in this summary are supported by a massive evidentiary body already in the Applicant's possession.**
Over the past ten years, more than **30,000 emails** (out of over 100,000 total), documents, recordings, banking exchanges, administrative correspondence, and digital logs have been preserved and classified for judicial use.

**Every factual assertion summarised here is traceable to documentary records that already exist and that can be produced as soon as the Court provides a secure transmission channel.**

However, due to proven interception of postal, digital, and telecommunication channels, **none of these materials can be safely transmitted** until the Court provides a protected route for evidence delivery.

In addition to the Applicant's own archives, **crucial complementary evidence remains in the hands of counterparties** who are currently refusing access, including (but not limited to) :

• **Oleen** — withholding complete professional email archives and thereby preventing recovery of decisive banking correspondence ;
• **Multiple financial and commercial entities** — holding internal communications, CRM logs, call records, routing metadata, and records of interventions that will corroborate systemic obstruction.

The Applicant therefore requests that the Court :

1. **Provide a secure channel** for evidence transmission ;
2. **Order preservation** of all records held by counterparties ;
3. **Authorize phased submission** of materials immediately once a protected pathway is established.

This ensures that *every factual assertion contained in the Executive Summary and in the full petition can be demonstrated through extensive documentary evidence already in existence and ready for production.*

---

# B) 6) URGENT REQUESTS — REVISED AND REORDERED (FINAL VERSION)

## B) 6) 1) Emergency hearing (remote within 48h)

→ **Recorded, formal, and procedurally valid.**

## B) 6) 2) Declaration of forfeiture of defence rights

→ **Including accelerated procedure and adjudication based on Applicant's evidence.**

## B) 6) 3) Freezing Order — €500M

→ To prevent dissipation and stabilise procedural ability.

## B) 6) 4) Emergency provision / interim relief — €7M

→ **Housing, equipment, safety, secure comms, legal work, mobility.**

## B) 6) 5) Protection measures

→ Anti-retaliation
→ Secure judicial communication channel
→ Remote hearings
→ Evidence deposit protocol

## B) 6) 6) Registration and acceptance of all filings (past and future)

→ Including previously intercepted LRAR, emails, DHL, and submissions.

## B) 6) 7) Judicial supervision of respondent institutions

→ Banks, employers, service providers, digital operators.

## B) 6) 8) Immediate evidence preservation orders

→ France / UK / US.

# C) 1) RECENT ESCALATION AND IMMEDIATE PERSONAL DANGER (AUG–DEC 2025)

**This introductory section provides the Court with a precise account of the Applicant's personal situation between August and December 2025, during which the level of danger, exhaustion, logistical sabotage, and economic destruction reached unprecedented intensity. These events are not isolated: they are cumulative, coordinated, and directly correlated with each attempt to engage judicial mechanisms.**

**The Applicant is alive today only by chance. The pattern described below demonstrates an immediate and credible risk of irreparable harm.**

---

## C) 1) A) — Sabotage of the Applicant's Vehicle After Geneva (High-Lethality Incident)

Following the Applicant's travel to Geneva to meet lawyers and attempt submissions to UN bodies, a **dangerous and abnormal loss of adhesion** occurred on his vehicle:

- The incident happened **shortly after leaving Geneva**, on winter roads.
- The Applicant had driven thousands of kilometres before this without any issue.
- He has since driven **several thousand kilometres more**, including in worse winter conditions, **with zero recurrence**, proving the problem was not mechanical nor weather-related.
- The timing and the characteristics of the loss of adhesion strongly indicate an **external substance applied to the tyres**, intended to provoke a catastrophic accident.

This is a **life-threatening event** directly connected to a judicial step:

*"This was not an accident. This was an attempt to eliminate me during an international legal action."*

---

## C) 1) B) — 5,000 kms Driven in 6 Days Under Extreme Conditions (Winter, No Sleep, No Safety)

To preserve evidence and attempt physical filings (given the interception of postal and electronic channels), the Applicant has been forced to drive :

- **5,000 kms in 6 days**,
- In **winter conditions**,
- With **almost no sleep** (6 hours in 72 hours),
- With **no financial means**,
- With **no support**,
- And while being fully aware that his vehicle had **recently been sabotaged**.

This extreme and sustained exhaustion was not a choice but the *only remaining way* to reach judicial institutions physically, after every digital and postal access was destroyed.

---

## C) 1) C) — Sleep Deprivation and Forced Survival Conditions

During these trips, the Applicant was repeatedly forced to :

- **Sleep in his car**, in temperatures between 0°C and 2°C.
- Do so **not only due to lack of funds**, but because :
    - His phone network was cut,
    - His GPS disabled,
    - No hotel could be located,
    - No assistance could be contacted.

This is a **dangerous survival scenario**, not a travel inconvenience.

Such conditions create:

- Hypothermia risk,
- Driving impairment,
- Cognitive collapse,
- Increased probability of fatal mistake.

The cumulative danger is deliberate:

*"They know exhaustion weakens vigilance. The goal is not to block me ; it is to break me."*

---

## C) 1) D) — Imminent Fuel Shortage on the Motorway With No Phone Network

On one of these nights, the Applicant:

- Could not locate a petrol station due to **network shutdown**,
- Had **no GPS**,
- No way to call for assistance,
- And was about to run out of fuel on a motorway in a foreign country,
- After **two nights without sleep** and **extreme stress** following the fabricated London "hearing".

This scenario constitutes a **near-fatal trap** :

→ If he had stopped on the motorway,
→ With no phone,

→ In freezing temperatures,
→ And complete exhaustion,

**Nobody would have found him or helped him.**

---

## C) 1) E) — Interruption of Telecommunication Services at Critical Moments

Throughout these months:

- The Applicant's main mobile line was cut in foreign countries **despite operator messages confirming roaming activation**.
- His backup lines were simultaneously disrupted.
- This left him **without GPS, without emergency calls, without ability to find basic shelter.**

This pattern of synchronized shutdowns is technically unnatural and consistent with targeted interference.

---

## C) 1) F) — Collapse of Financial Stability (Destruction of Professional Activity)

Since autumn 2025 :

- The Applicant has **lost all recurring clients**,
- Has no revenue stability,
- Has suffered repeated sabotage of client files by banks (documented),
- And faces a **professional extinction** orchestrated via :

### C) 1) F) (a) Filtration of all LinkedIn contacts

→ Destroying his prospecting capacity,
→ Cutting him from his professional network.

### C) 1) F) (b) Refusal by Oleen (former partner) to release crucial email archives

→ Despite formal notices,
→ Hiding proof of bank obstruction.

### C) 1) F) (c) CAFPI/LoanPlace installing a prohibited remote-control software on his PC

→ Blocking his new job,
→ Preventing use of mandatory professional email,
→ No corrective action despite repeated requests.

## C) 1) F) (d) Empruntis (current employer) paralyzed

→ After receiving an intercepted and illegally transmitted email from the bank Milleis,
→ Never responding to the Applicant's warning letter,
→ Leaving him unable to work.

## C) 1) F) (e) Mercifacteur no longer responding

→ Making it impossible to send secure registered letters,
→ Effectively destroying access to courts.

This is not economic difficulty.
This is **forced economic suffocation**.

---

# C) 1) G) — Psychological and Physical Collapse Engineered Over Time

Across all events, one pattern appears:

- Chronic exhaustion,
- Sleep deprivation,
- Repeated travel in dangerous conditions,
- Engineered isolation,
- No access to communication,
- No access to safety,
- No access to justice,
- Threats escalating after each judicial initiative.

This is a **strategy of cumulative collapse**.

The Applicant states :

*"These methods are used because prison and psychiatric internment have already been applied to me. They now use exhaustion, danger, deprivation and isolation. The goal is not to hinder me. The goal is to make me disappear."*

**This is not rhetoric.**
**It is the only plausible explanation for this coherent pattern.**

---

# C) 1) H) — Legal Characterisation

Under ECHR, UK and US standards, the situation constitutes :

- **Real, immediate and personal risk to life (Art. 2 ECHR)**
- **Risk of inhuman/degrading treatment (Art. 3)**
- **Destruction of access to justice (Art. 6 + Art. 13)**
- **Retaliation against a complainant (UN CAT, ICCPR)**
- **Obstruction warranting emergency protective measures.**

This section demonstrates that the danger is:

**Imminent**
**Cumulative**
**Escalating**
**Intentional**
**And connected to judicial activity.**

# C) 2) SYSTEMIC OBSTRUCTION OF JUSTICE (ECHR — UK HIGH COURT — US DISTRICT COURT)

**This section documents the systemic and coordinated obstruction of the Applicant's access to justice across three distinct and independent judicial systems:**
**(1) the European Court of Human Rights (Strasbourg),**
**(2) the High Court of Justice of England and Wales (London), and**
**(3) the United States District Court for the District of Columbia (Washington DC).**

The convergence of obstructions in all three jurisdictions — postal, digital, physical, and procedural — is incompatible with coincidence and demonstrates interference by actors with State-level or para-State capabilities.

---

## C) 2) A) — Obstruction at the European Court of Human Rights (Strasbourg)

### C) 2) A) (a) Physical obstruction (25 November 2025)

The Applicant travelled more than 2,000 kms to file an urgent Rule 39-equivalent request. Despite invoking a life-threatening situation, he was:

- Blocked at the entrance by security staff,
- Refused access to a Registrar,
- Instructed to complete a non-mandatory "form" on the pavement,
- Denied a reference number,
- Handed only an informal handwritten slip,
- And given a phone number that reached an automated message.

This is **unprecedented** in ECHR practice and incompatible with Article 34 ECHR.

### C) 2) A) (b) Postal obstruction (LRAR disappearance)

Over eight registered letters sent via French LRAR — a State-dependent service — **never received a single acknowledgement**.
Not one.

This is not a technical failure.
It is deliberate interception of filings addressed to an international court.

### C) 2) A) (c) Legal implications

- Violation of Article 34 ECHR (right of individual application)
- Violation of Article 13 (effective remedy)
- State interference prohibited under ECHR

- Destruction of emergency protection channels under Article 2 and 3

Given the nature and timing of the obstruction, the Applicant reasonably believes the interference originates **not from ECHR staff**, but from **external State-level actors** capable of monitoring travel, controlling post, and intercepting communications.

---

# C) 2) B) — Obstruction at the UK High Court of Justice (London)

### C) 2) B) (a) Interception of emails and postal mail

Prior to the Applicant's physical arrival:

- All emails to the High Court disappeared or were filtered,
- All registered letters failed to reach the Court,
- No acknowledgment was ever received.

This dual interception — digital and postal — cannot be achieved by ordinary individuals.

### C) 2) B) (b) Fabricated or irregular "hearing" (26 November 2025)

When the Applicant unexpectedly travelled to London :

- He was brought before a "judge" within five minutes,
- Which is impossible under emergency listing rules ;
- The judge refused ID, refused documents, refused USB drives, refused any record of the hearing ;
- The judge did not examine threats to life, obstruction evidence, poisoning attempts, or unlawful detention ;
- The judge mocked the Applicant ("But you are here, aren't you?") ;
- The hearing was deliberately stripped of any procedural formality ;
- The Applicant was escorted out without any trace of submission.

This event mirrors **a fabricated diversion**, not a judicial act.

### C) 2) B) (c) Legal implications

- Violation of CPR Part 25 (interim remedies)
- Violation of judicial recording obligations
- Denial of the right to submit evidence
- Breach of impartiality and fairness duties
- Procedural interference incompatible with judicial independence

The only reasonable assessment is that the hearing was **manipulated or constrained by external pressure**.

---

# C) 2) C) — Obstruction at the U.S. District Court for the District of Columbia

The Applicant attempted submissions to the U.S. District Court via DHL, email ;

## C) 2) C) (a) DHL package "delivered" but no contact from the Court

A DHL package sent from London was marked as "delivered" nearly two weeks ago, yet:

- No acknowledgment,
- No email,
- No letter,
- No phone call,
- No docket entry.

Given U.S. federal procedural norms, this is highly irregular.

## C) 2) C) (b) Email and phone interference

The Applicant reasonably believes that:

- Any attempt by the Court to reach him via email **fails**, due to pirated accounts;
- Any attempt to reach him by phone **fails**, due to filtering and interception of calls ;
- He has no stable channel through which a U.S. court can contact him.

This means the Applicant cannot receive:

- Filing confirmations,
- Deficiency notices,
- Docket numbers,
- Emergency hearing schedules.

## C) 2) C) (c) Legal implications

Under U.S. federal law (Federal Court Interpreters Act; Due Process Clause) :

- Access to the Court is effectively **nullified**,
- Communication channels are sabotaged,
- The Applicant is prevented from exercising procedural rights,
- And the Court itself appears unable to reach him.

This constitutes **a systemic barrier to justice**, not an administrative irregularity.

_____

## C) 2) D) — Converging Obstruction Across Three Jurisdictions

Taken together, the following pattern emerges :

1. **Interception of LRAR post** (France → Strasbourg)
2. **Interception of DHL packages** (UK → US)
3. **Interception of emails** (ECHR, UK, US)
4. **Blocking of phone lines** at critical stages
5. **Physical blocking** at ECHR
6. **Fabricated/irregular hearing** at the UK High Court
7. **Complete absence of acknowledgment** from U.S. courts
8. **Monitoring of Applicant's movements and filings**
9. **Obstruction escalating immediately after each judicial attempt**

This requires:

- Control of postal routing systems,
- Access to international courier routing,
- Email interception capacity,
- Telecommunication filtering,
- Real-time monitoring of travel and location,
- Influence over or penetration of judicial processes.

These capacities are **incompatible with private actors**.
They indicate **State-level or para-State interference**.

---

## C) 2) E) — Legal Conclusion

Across ECHR, UK and US systems, the Applicant's right to access a court has been :

**Obstructed**
**Intercepted**
**Diverted**
**Fabricated**
**Nullified**
**And weaponised against him.**

Under international standards :

- France has violated Article 34 ECHR (right of petition),
- Access to effective remedy (Art. 13) has collapsed,
- The Applicant faces retaliation for seeking justice,
- And obstruction nullifies the State's right to defend itself ("forfeiture through interference").

The Applicant is effectively **prevented from reaching any jurisdiction capable of reviewing the actions of the French State** — a situation that satisfies all criteria for :

→ **urgent protective measures**,
→ **remote hearings**,
→ **evidence preservation orders**,
→ **and immediate judicial intervention.**

# C) 3) LEGAL CONSEQUENCES AND URGENT REQUESTS FOR PROTECTIVE MEASURES

*(Synthesis for ECHR — UK High Court — US District Court)*

**This section synthesises the legal consequences of the extreme personal danger (Section C)1) ) and the systemic obstruction of access to justice (Section C)2) ).**
Across three jurisdictions, the Applicant's rights have not merely been limited — they have been **annihilated**.

The situation meets the highest threshold for immediate international judicial intervention.

---

# C) 3) A) — The Applicant Is Currently Deprived of All Effective Remedies

22

Based on Sections C) 1) and C) 2), the Applicant is deprived of :

- **Physical access** to courts (ECHR, UK),
- **Postal access** to courts (France, ECHR, UK, US),
- **Electronic access** (emails intercepted),
- **Telephonic access** (lines filtered),
- **Procedural access** (fabricated hearings, rejected filings),
- **Legal assistance** (due to intimidation of lawyers across multiple jurisdictions),
- **Financial stability** (engineered destruction of income),
- **Physical safety** (vehicle sabotage, poisoning attempts, isolation abroad).

This full collapse of access satisfies the definitions of :

- **Article 6 ECHR** (denial of a fair hearing),
- **Article 13 ECHR** (denial of an effective remedy),
- **Article 2 and 3 ECHR** (life-threatening situation + degrading treatment),
- **ICCPR Articles 2, 14, 26,**
- **UK constitutional safeguards,**
- **US Due Process Clause.**

The Applicant has **no remaining judicial doorway** that functions normally.

---

## C) 3) B) — Irreparable Harm Is Already Occurring and Will Continue Without Intervention

The Applicant faces **three overlapping categories of irreparable harm**:

### C) 3) B) (1) Physical Harm

From sabotage, exhaustion, hypothermia risk, dangerous travel conditions, and isolation without communication.

### C) 3) B) (2) Procedural Harm

Every failed filing, every intercepted letter, every diverted hearing produces irreversible procedural consequences.

### C) 3) B) (3) Economic Harm

The Applicant's global economic prejudice is now:

- **€124.4 billions,**
  - including **€78 billions for Lucy Bank,**
  - **€46.4 billions for the real-estate/démembrement model,**
- With additional categories still being calculated.

This prejudice increases daily due to the impossibility of operating, defending, or rehabilitating the Applicant's ventures.

---

## C) 3) C) — State-Level Obstruction Nullifies the Respondent State's Right of Defence

International law provides that when a State :

- **Intercepts filings,**
- **Blocks access,**
- **Fabricates procedures,**
- **Retaliates against the applicant,**
- **Or destroys the adversarial balance,**

Then the State **forfeits** the right to oppose the application.

This principle exists in :

- ECHR case-law (Airey, Mamatkulov, Ilascu, Kolevi),
- UN jurisprudence on reprisals,
- UK due-process doctrine,
- U.S. federal principles on obstruction.

**France's systematic interference across three jurisdictions satisfies this condition.**

---

## C) 3) C-bis) — Forfeiture of the Right of Defence (Doctrinal Consequence of Obstruction)

**Under ECHR doctrine, UN jurisprudence, UK constitutional principles, and U.S. due-process standards, a party that deliberately destroys the conditions of adversarial proceedings forfeits its procedural right to be heard.**

This doctrine applies when a State or any associated actors:

- Intercept filings or prevent their delivery,
- Block physical or electronic access to a court,
- Manipulate or fabricate procedural events,
- Retaliate against the applicant for seeking justice,
- Or create conditions making it materially impossible for the applicant to present their case.

In such circumstances, **the adversarial balance no longer exists**, and the State (together with any actors whose conduct contributed to the obstruction) cannot rely on procedural rights it has itself destroyed.

24

The consequence is clear:

**"A party that obstructs justice may not invoke the right to defend itself."**
*(ECHR : Ilascu, Mamatkulov; UN CAT : General Comment 4 ; UK : Constitutional Fairness Doctrine ; US : equitable estoppel and unclean hands)*

Given the systemic, documented, and multi-jurisdictional obstruction established in Sections C) 1) and C) 2), the Respondent State and any actors participating in or benefiting from this obstruction have, through their own conduct, **forfeited their procedural right to challenge the Applicant's claims**, unless and until they restore full access to justice — which is currently impossible.

This principle is not punitive :
**it is a structural safeguard designed to prevent a party from defeating justice through obstruction.**

Accordingly, the Court is entitled to proceed on the basis of the Applicant's evidence alone, with the Respondent State deemed in default for having neutralised the adversarial framework.

---

# C) 3) D) Requests for Immediate Judicial Measures

## C) 3) D) (1) Emergency Hearing (within 48 hours)

A real, recorded, procedurally valid hearing — remote if necessary — must be scheduled. The Applicant cannot travel safely.

## C) 3) D) (2) Freezing Order (France) — €500 millions

This is the minimum amount necessary to preserve the Applicant's rights, prevent asset dissipation, and compensate ongoing damage during proceedings.

## C) 3) D) (3) Emergency Provision / Interim Relief — €7 millions

To ensure basic safety, legal functioning, housing, communication, evidence gathering, and travel necessary for the proceedings.

## C) 3) D) (4) Protection Measures

- Secure communication channel,
- Point of contact for evidence transfer,
- Guarantee against interception,
- Explicit prohibition of retaliation,

- Remote-hearing protocol valid for all steps of the trial.

## C) 3) D) (5) Acceptance of All Submitted Evidence

Given that normal channels have been destroyed, any evidence submitted by physical delivery, USB, or digital alternative must be accepted without penalisation for format irregularities.

## C) 3) D) (6) Registration of All Filings Despite Prior Interception

Courts are requested to formally record :

- All LRAR filings,
- All DHL filings,
- All attempted email submissions,
- All emergency requests,
- Whether or not they were delivered on time.

---

# C) 3) E) — Legal Qualification

The Applicant's situation meets the highest threshold for :

- **Rule 39 Interim Measures (ECHR)**
- **Emergency Interim Relief / Freezing Orders (UK : CPR 25)**
- **TRO / Preliminary Injunction standards (US : Fed. Rules / equitable relief)**

Because:

- Harm is **real**,
- Harm is **immediate**,
- Harm is **irreparable**,
- Obstruction is **systemic**,
- The State's interference destroys procedural balance,
- And without intervention the Applicant risks **death**, **procedural disappearance**, or **economic annihilation**.

---

# C) 3) F) — Right to Survival Pending Proceedings (Positive Obligations of the Court)

Under established ECHR doctrine (Art. 2 and 3), UK constitutional jurisprudence (Osman v. UK), and U.S. due-process safeguards, a Court must ensure that a litigant remains **alive, safe, and able to participate** in proceedings.

Where a party faces targeted danger, exhaustion, sabotage, or deprivation linked to the litigation, the Court has a **positive obligation** to take immediate protective steps.

In the Applicant's situation :

- Attempted poisoning,
- Vehicle sabotage,
- Forced exhaustion through long-distance travel,
- Inability to secure housing,
- Isolation abroad without communications,
- Documented retaliation after every filing attempt,

Demonstrate a **real, immediate, and foreseeable risk to life**.

**A Court cannot allow a litigant to die, disappear, or fall into destitution pending the resolution of a case.**

Accordingly, urgent protective measures — including financial provision, remote hearings, safe housing, and logistical support — are not discretionary; they are part of the Court's fundamental obligations.

---

# C) 3) G) — Right to Means of Procedure (Minimum Material and Technical Conditions)

Article 6 ECHR, the UK fairness doctrine, and U.S. procedural standards all confirm that access to a court is not theoretical: it requires **practical and effective** means.

A litigant must have :

- A functioning telephone line,
- An unpirated computer,
- Secure internet access,
- Safe transportation,
- Stable housing,
- And minimal financial autonomy.

The Applicant has none of these, due to :

- Interception of all lines,
- Sabotage of professional equipment,
- Control of his primary PC by a former employer,
- Impossibility of using professional emails,
- Collapse of income engineered through obstruction,
- Absence of secure accommodation or safe location.

Therefore, the Court must ensure the Applicant receives:

- **Replacement of compromised equipment,**
- **Secure telecommunication channels,**
- **Financial means to relocate,**
- **Safe travel capacity,**
- **Minimum living conditions compatible with participation in the trial.**

The requested €7 millions provisional relief directly corresponds to these obligatory procedural guarantees.

---

## C) 3) H) — Right to Relocation or Safe Housing as an Interim Measure

When a litigant faces life-threatening danger related to judicial activity, international courts recognise the possibility — and necessity — of **temporary relocation** or provision of **safe housing**.

This principle arises in ECHR interim measures, UN CAT reprisal cases, and U.S. federal protective orders.

Given:

- Vehicle sabotage designed to cause fatal accidents,
- Poisoning attempts abroad,
- Inability to use hotels due to blocked communications,
- Nights spent in freezing temperatures in a vehicle,
- Total isolation created by phone network shutdowns,
- The impossibility to travel safely to or within Europe,

The Applicant's physical location is **unsafe**.

A relocation or protected housing order is therefore aligned with the Court's obligation to preserve life and ensure effective participation.

Such relocation also prevents further procedural sabotage and protects the integrity of the judicial process.

---

## C) 3) I) — Protective Communications Channel (Mandatory Due to Interception)

The Applicant's case demonstrates global interception of :

- Emails,
- Phone calls,
- SMS verification codes,

28

- Professional accounts,
- Postal mail (LRAR),
- International courier services (DHL),
- And digital filings to courts.

No litigant can participate in proceedings under such conditions.

International legal standards require the Court to create or designate **a protected, Court-controlled communication channel**, such as :

- A direct judicial mailbox,
- An encrypted secure portal,
- A protected telephone line,
- Or a case officer with direct oversight.

This measure is indispensable to prevent continued interference and ensure that:

- Notices,
- Decisions,
- Instructions,
- And evidence exchanges

reach the Applicant safely.

Without such a channel, the proceedings themselves would be structurally compromised.

---

# C) 3) J) — Preventive Injunction Against Retaliation and Harassment

The Applicant has suffered continuous retaliation linked to each procedural step:

- Attack on professional clients,
- Threats to employment,
- Sabotage of credit files by banks,
- Manipulation of employers,
- Obstruction of communications,
- Targeted danger during travel,
- Economic suffocation,
- And interference with his family support.

International law (UN CAT, ECHR, US federal injunction principles) requires courts to **prevent further retaliatory measures** once a litigant has demonstrated credible danger.

The Court must therefore issue a protective injunction prohibiting:

- Interference with the Applicant's employment,
- Tampering with his clients or contracts,

- Interception of communications,
- Physical intimidation or surveillance,
- Any actions targeting his family,
- Destruction of digital or corporate evidence.

This injunction preserves not only the Applicant's safety but also the integrity of the proceedings themselves.

---

## C) 3) K) — Global Evidence Preservation Order

Given the systematic disappearance or obstruction of evidence — including emails, registered mail, professional accounts, digital files, and postal tracking — the Court must issue a **worldwide preservation order** requiring:

- Former employers (CAFPI / Loanplace, Oleen, etc.),
- Email service providers,
- Telecom operators,
- Postal and courier services,
- Banks involved,
- And any State-linked bodies

To freeze all relevant data :

- Email logs,
- Server access logs,
- Mailbox contents,
- Device records,
- Customer records,
- CRM exports,
- PDF archives,
- IP connection logs,
- Internal communications relating to the Applicant.

This is standard in U.S. federal practice and admissible in European human-rights litigation when evidence destruction is suspected.

## C) 3) L) — Final Declaration

Given the total collapse of access to justice, the deliberate infliction of personal danger, the destruction of all procedural channels, and the evidence of State-level and multi-actor obstruction, the Applicant respectfully requests that the Court :

1. **Assume immediate oversight of the case**,
2. **Apply the full set of requested interim measures**, including freezing orders, protective relocation, secure communications, and provisional financial relief,
3. **Consider the Respondent State and all actors participating in the obstruction as having forfeited their procedural right to be heard,**

4. **Treat all past and future interference as aggravating factors requiring accelerated examination,**
5. **And ensure the Applicant's survival, safety, and ability to participate effectively in these proceedings.**

The Applicant reiterates that without urgent intervention from the Court, the combination of physical danger, economic suffocation, and systemic interference will result in irreparable harm — to his life, to the integrity of the evidence, and to the effective administration of justice.

In light of Sections C) 1) to C) 3), the Applicant now formally enters the proceedings and states the following Preliminary Conditions of Appearance.

# D) Preliminary Statement – Special Conditions of Appearance

**To :**

**European Court of Human Rights – Urgent Filings (Rule 39)**
Registry of the European Court of Human Rights
**ECHR 67000 Strasbourg – France**

**High Court of Justice – King's Bench Division – Urgent Applications Court**
The Rolls Building
**7 Rolls Buildings, Fetter Lane, London EC4A 1NL – United Kingdom**

United States District Court for the District of Columbia – Emergency Filings
333 Constitution Avenue NW, Washington DC 20001 – USA

---

# D) 1) Self Representation :

I appear personally **out of absolute necessity**, due to a decade-long impossibility to obtain legal representation.

More than **one hundred attorneys** across France, the EU, the UK, the US and the UAE have been contacted.
All refused, withdrew, or became silent under circumstances consistent with **external pressure, obstruction, or intimidation**.

This constitutes a cumulative violation of :

- **Article 6 §§1 and 3(c) ECHR** (right to a fair trial + right to legal assistance),
- **Article 14(3)(d) ICCPR,**
- **Article 47 EU Charter of Fundamental Rights,**
- **U.S. Constitutional Due Process,**
- **UK constitutional principles (Unison; Miller).**

Since the right to counsel has been **destroyed in practice**, I therefore exercise **self-representation**, in accordance with :

- *Faretta v. California*, 422 U.S. 806 (1975),
- FRCP Rule 17(c) (representation in person),
- CPR 39.2 and CPR 3.1(2)(m) (UK litigant-in-person protections).

**This appearance is a necessity, not a choice.**
It must therefore receive full procedural protection.

# D) 2) Request for Court-Appointed Interpreter (ECHR — UK — US)

**Given the technical nature of these proceedings, the cross-jurisdictional framework, and the fact that English (and possibly French, depending on the forum) is not my mother tongue, I respectfully request the appointment of a Court-certified interpreter for any oral communication or hearing before the European Court of Human Rights, the High Court of Justice in the United Kingdom, and the U.S. District Court for the District of Columbia.**

**This request is grounded in Article 6 ECHR (effective participation), the Human Rights Act 1998 (UK), and the Federal Court Interpreters Act (U.S.). Each of these instruments recognises that a litigant-in-person must be provided linguistic assistance when needed to ensure fairness and equality of arms.**

I therefore ask each Court to confirm that an interpreter will be appointed for all hearings — including emergency hearings, remote hearings, and any interaction requiring technical legal English.

---

## D) 3) Temporary Fee Waiver — With Moral Commitment of Reimbursement

Due to :

- Engineered economic destruction,
- Coerced impoverishment,
- Disappearance of income,
- Interception of client contracts,

… I am presently unable to pay filing fees.

Under :

- **Article 6 ECHR** ("access must be practical and effective"),
- **Airey v. Ireland (1979)**,
- **FRCP 24 & 28 U.S.C. 1915 (in forma pauperis)**,

I respectfully request a **temporary waiver of court costs**.

I solemnly undertake that once my financial autonomy is restored:

1. **All waived fees will be reimbursed**, and
2. **An equivalent donation will be made to a local charitable organisation.**

---

## D) 4) Substantive Judgment Only (No Procedural Dismissal)

Given the structural impossibility to obtain counsel, courts must ensure that proceedings focus on **substance**, not procedural formality.

Under :

- **Article 6 ECHR (fairness, equality of arms)**,
- *Kress v. France* (2001),
- *Steel & Morris v. UK* (2005),

A purely formal or procedural rejection would constitute a **denial of justice**.

I respectfully request that the case be examined **on its merits only**, in its **substantive dimension**, without penalisation for lack of counsel.

---

## D) 5) Remote Proceedings (Mandatory for Safety and Feasibility)

I request that any hearing be held **remotely**, via secured video link, because :

### D) 5) (1) Personal Safety

I have been the target of :

- Illegal detention,
- Attempted poisoning,
- Forced sedation,
- Vehicle sabotage,
- Physical shadowing (50–150 persons),
- And threats directly correlated with legal steps.

Physical attendance therefore increases the risk of harm.
This falls under:

- **Articles 2 and 3 ECHR**,
- UK duty to protect life (Osman),
- US due process protections.

### D) 5) (2) Logistical Impossibility

Without counsel, resources, or income, long-distance travel to multiple jurisdictions is **materially impossible**.

### D) 5) (3) Legal Foundation for Remote Hearing

- UK : Practice Direction 51Y
- US : judicial discretion (FRCP 43(a))
- ECHR : remote Rule 39 hearings in urgent cases

A remote hearing guarantees **safety, fairness, and feasibility**.

---

## D) 6) Scope and Applicability Clause (Tri-Jurisdiction Framework)

This preliminary declaration applies to **all current and future proceedings** before:

- **ECHR** (Rule 39, Rule 47),
- **UK High Court**, Court of Appeal, Supreme Court,
- **US District Courts**, Courts of Appeal, Supreme Court,
- And where relevant :
  **European Commission, EPPO, UN Special Procedures, Council of Europe, Interpol**.

It forms an integral part of :

- **The emergency filing**,
- **The 48-hour hearing request**,
- **The freezing order request**,
- **And all subsequent stages of the proceedings.**

**Executed in Mérignac, on 24 11 2025**
**Pierre Deglaire**

# E) – PREAMBLE NOTE — EXCEPTIONAL NATURE OF THE CASE

Before any consideration of form or procedure, the Court must be aware of the **extreme, unique, and unprecedented nature** of the situation submitted to its authority.

Can one cite a single precedent in which an individual — alone, without means, without protection — has resisted for more than ten years coordinated attacks emanating simultaneously from :

- Governmental structures,
- The entire banking sector of his country,
- And multiple private, economic and institutional actors ?

During this period, his life was placed at direct risk :

35

- Illegal imprisonment abroad,
- Forced psychiatric internment in France,
- Sedation without medical cause,
- Poisoning attempts,
- Abnormal vehicle sabotage,
- Repeated physical shadowing,
- And permanent psychological harassment designed to force collapse.

Over this decade of aggression :

- More than one hundred international lawyers were contacted, and none accepted to represent him,
- Access to French national justice was denied at every level, from the local lawyer to the National Financial Prosecutor's Office,
- Thirty-five foreign embassies were approached and none intervened,
- Major associations, unions, political parties, and national and foreign media were all alerted, and none responded.

This **total abandonment** places this case **outside the scope of ordinary litigation**.
No standard domestic or international procedure can apply to such a configuration, where the victim is isolated against a structured system of persecution, silencing, and concealment.

Yet this case is not limited to the suffering of one man.
Mr. Pierre Deglaire carried citizen projects with direct social value :

- The creation of a bank guaranteeing deposit safety and redistributing profits to households in difficulty,
- Solidarity-based real estate programs helping retirees, families in transition, and people facing housing insecurity.

These initiatives — blocked or destroyed by the attacks — would have benefited thousands, potentially millions.

The evidence accumulated — tens of thousands of documents, timelines, internal notes, correspondences, administrative decisions — leaves no ambiguity regarding :

- The reality of the attacks,
- Their intensity and continuity,
- Their deliberate intention to destroy the person, his family, and his civic and economic projects,
- And the probable involvement of numerous individuals across the State, banking institutions, and private companies.

The damages are equally indisputable.
They have been measured, documented, demonstrated, and presented in their most conservative estimation.
Even with such prudence, they represent massive losses resulting from ten years of direct obstruction, blocked operations, and destroyed opportunities.

36

Thus, the question presented to the Court is **not** whether the facts exist — they are established.
It is **not** whether the damage is real — it is quantified and documented.
The question is now whether the **law will finally be allowed to operate**, when France has refused it at every level and structurally prevented access to any remedy.

The true issue for the Court is therefore clear :

**Will you apply the law and your judicial mandate, in accordance with fundamental principles, to restore at least a minimum of justice, safety, and institutional integrity ?**

This initiative is not undertaken in the name of personal interest alone.
It is undertaken **in the name of the law**, of society, and of the citizens who were supposed to benefit from these economic and social projects.

In light of its exceptional, life-threatening and structurally obstructed nature, the Petitioner respectfully requests that the Court examine this case **within the emergency framework described in the following sections**, and set aside any ordinary procedural formalism, in order to apply **the very spirit of the law** : the law that protects individuals against arbitrariness, corruption, and the organised destruction of truth.

---

# F) MULTI-JURISDICTIONAL HARM ALLOCATION AND ANTI-DUPLICATION FRAMEWORK

This emergency filing is lodged simultaneously with three competent jurisdictions:

(i) **The European Court of Human Rights (Rule 39 emergency review),**
(ii) **The High Court of Justice of England and Wales (Urgent Applications Court),**
(iii) **The United States District Court for the District of Columbia (Emergency injunctive relief under FRCP 65),**

each of which retains jurisdiction over distinct and non-overlapping components of the global harm incurred.

In accordance with:

- Regulation (EC) No 864/2007 (Rome II), Arts. 4–15,
- Regulation (EC) No 593/2008 (Rome I),
- ECHR Articles 2, 3, 6, 8 and 13,
- UK conflict-of-laws doctrine (Johnson v Gore Wood [2002] 2 AC 1; Virgin Atlantic v Zodiac [2014] UKSC 46 ; OBG v Allan [2007] UKHL 21),
- U.S. Restatement (Second) of Judgments §§ 24–26, Baker v GM (522 U.S. 222), Offshore Logistics v Tallentire (477 U.S. 207),
- And the doctrine of "procedural impossibility" (ECHR jurisprudence),

The Applicant expressly affirms that:

## F) 1). Each jurisdiction addresses a distinct portion of the harm, consistent with its competence and governing law:

- **ECHR (Rule 39)** : life-threatening circumstances, systemic obstruction, impossibility of access to domestic justice, violations of Articles 2, 3, 6 and 13 ECHR.
- **United Kingdom (High Court – Urgent Applications Court)** : economic torts, coercion, misrepresentation, interference with contractual and professional relations, and immediate freezing injunctions.
- **United States (District Court – DC)** : digital interference, privacy violations, interception of international communications, cross-platform data breaches, and emergency protective injunctions.

## F) 2). No double recovery is sought.

Each head of loss is allocated to the appropriate forum.
The relief sought in each jurisdiction concerns **separate harms**, arising from distinct factual and territorial circumstances.

## F) 3). Parallel findings of liability are not only possible but necessary.

The harms arise from **autonomous wrongs** committed across multiple countries.
Parallel judicial determinations are therefore consistent with conflict-of-laws doctrine.

## F) 4). Judicial sovereignty of each court is fully preserved.

None of the forums is asked to override or absorb the competence of the others.
Each tribunal adjudicates only the harms within its exclusive remit.

## F) 5). Enforcement harmonisation is expressly reserved for the post-judgment phase, under:

- Regulation (EU) 1215/2012 (Brussels I Recast),
- UK Enforcement of Foreign Judgments Act,

- U.S. Full Faith and Credit Clause and the Uniform Foreign-Country Money Judgments Recognition Act.

**F) 6). This structure prevents forum shopping, procedural fraud, and inconsistent judgments.**

Each tribunal receives a **clean, self-contained, jurisdiction-specific file**, while the global structure prevents overlap or duplication.

**F) 7). Transmission to the other jurisdictions forms part of the emergency mechanism.**

Due to structural impossibility, physical danger, and interception of filings, the Applicant formally requests that the Court **transmit the entire file** to the other two jurisdictions, ensuring simultaneous seisin.

This harmonisation clause governs the emergency phase (Rule 39, 48-hour hearing, injunctive relief) and the substantive phase to follow, ensuring methodological consistency across the 241125 Global Filing.

# G) 1) INTERNATIONAL LEGAL CORE SUBMISSION

**(Executive Summary, Legal Foundations, Application of Law, Requests for Relief, Annex S01)**

---

# G) 1) A) — EXECUTIVE SUMMARY + FULL FACTUAL CONTEXT + COMPLETE LIST OF INSTITUTIONS CONTACTED

---

# EXECUTIVE SUMMARY (EXPANDED, UPDATED WITH STATISTICAL FINDINGS)

This memorandum establishes, with documented precision, that the Claimant has been subjected for more than a decade to **systemic obstruction, procedural impossibility, unlawful surveillance, destruction of economic autonomy, and life-threatening attacks** occurring in direct correlation with every attempt to access justice domestically or internationally.

Despite exceptional diligence — more than *one hundred and seven (107) written filings*, including international registered letters to courts, regulators, governments, political parties, and private corporations — the Claimant has received **no authentic official reply**, **no valid acknowledgment**, and **no traceable registration** from any jurisdiction.

Every procedural path, regardless of country, has been **structurally neutralised**.

This unprecedented pattern constitutes prima facie violations of :

- **Articles 2, 3, 5, 6, 8, 13, 34 ECHR**
- **UK Human Rights Act 1998**
- **U.S. Constitutional Law (5th and 14th Amendments)**
- **International Human Rights Customary Law**
- **UN Basic Principles on the Role of Lawyers**
- **UN Guidelines on the Right to a Remedy**

Beyond the legal dimension, the human reality must also be acknowledged:

**The Claimant has been forced to live inside a constructed informational bubble — a controlled environment where nothing around him corresponds to objective reality. All institutions appear absent, all remedies appear dead, and every attempt at help dissolves instantly.**

This human dimension reinforces the urgency of judicial intervention.
The Claimant is not attempting to manipulate proceedings — he is attempting to survive them.

Given:

- The total collapse of domestic remedies,
- The systemic interception of filings,
- The physical danger escalating with each legal attempt,
- And the verified impossibility of receiving institutional responses,

The Claimant respectfully requests that international courts adopt an **accelerated, reduced procedure**, bypassing adversarial hearings:

- **France has forfeited its right to defend,**
- **Normal procedure cannot function,**
- **Delays increase lethal risk,**

40

- **And obstruction is structurally proven.**

---

# G) 1) B). EXTENDED FACTUAL BACKGROUND (DETAILED VERSION)

## G) 1) B) 1). Ten years of continuous violations

The Claimant has endured:

- **Illegal detention abroad (Serbia)** in inhuman conditions.
- **Arbitrary psychiatric internments in France**, with sedation and fabricated diagnoses.
- **Three medically documented poisoning attempts.**
- **Vehicle sabotage** causing life-threatening crashes.
- **Large-scale organised surveillance** (50–150 persons at a time) in several countries.
- **Destruction of all income sources**, intentionally engineered.
- **Obstruction of major economic projects**, including the EU-validated LucyBank (loss = €27M/day).
- **Interference with dozens of clients**, who suddenly withdrew under unexplained pressure.

These converging facts indicate **state-level or state-linked interference** with the objective of neutralising the Claimant.

---

## G) 1) B) 2). Interception of communications — digital, postal, institutional

The Claimant uses **one single computer**, fully compromised.

All international filings originated from this compromised device.

Logical consequences:

- Disappearance of letters,
- Falsified acknowledgments,
- Missing reference numbers,
- Diverted or vanished emails,
- Corrupted submission forms.

This meets the ECHR doctrine of **procedural impossibility** (Kudła; M.S.S. ; Wille).

---

## G) 1) B) 3). Surveillance escalation during each filing attempt

Examples include:

- **Serbia** — 150 individuals surrounding him near consular services.
- **Switzerland** — ~60 individuals following during attempts to contact counsel.
- **United Kingdom** — repeated monitoring during visits to the High Court.
- **France** — 40–50 individuals tracking him during each institutional approach.

This demonstrates **transnational coordination** incompatible with random criminality.

---

### G) 1) B) 4). Destruction of economic autonomy

The Claimant experienced:

- Total collapse of DP&P Consulting,
- Obstruction of tens of millions in real estate deals,
- Collapse of the Dubai network,
- Forced impoverishment of his family,
- Pressure by bailiffs,
- False psychiatric classifications used to deny income and access to justice.

The aim is clear: **prevent him from defending himself.**

---

### G) 1) B) 5). Fabrication of psychiatric disorder

- **Serbia :** 3-week evaluation → *no disorder*.
- **France :** 2-minute "diagnosis" → *severe disorder*, without exam, while sedated.

Such manipulation has been condemned by the ECHR (Rakevich; Stanev).

---

# G) 1) C). LIST OF ALL INSTITUTIONS CONTACTED (FULL AND EXHAUSTIVE)

*(List unchanged except for statistical integration — full listing preserved as in original A1)*

France (President, PM, Justice Minister, PNF, CNIL, ACPR, DGCCRF, etc.),
Political parties (9),
French unions (3),
Associations (Anticor, Sherpa),
EU institutions (EP, EC, EPPO, OLAF, ECHR…),
UK (High Court, SFO, FCA…),

US (District Court DC, DOJ, FBI…),
Switzerland, Belgium, UAE, Serbia.

**Outcome:** *0 authentic replies. 0 official acknowledgments.*

Only **one** reply from the French Prime Minister's services — a postal letter with **questionable authenticity** (format inconsistent with French administrative standards).

---

# G) 1) D) STATISTICAL IMPOSSIBILITY OF INSTITUTIONAL SILENCE

*(Newly added section requested by the Claimant)*

### G) 1) D) 1). Overview of filings

The Claimant has sent a total of :

| Category | Number Sent | Official Replies | Verified Authentic Responses |
|---|---|---|---|
| International Courts (UK, US, Dubai, Tokyo, ECHR) | 27 | 0 | 0 |
| EU institutions + UN | 17 | 0 | 0 |
| French political parties | 9 | 0 | 0 |
| Global media rights agencies | 9 | 0 | 0 |
| Major French media outlets | 4 | 0 | 0 |
| U.S. VIP executives (top tech leaders) | 8 | 0 | 0 |
| French authorities (President, PM, Justice Minister) | 3 | 1 (suspect) | 0 |
| Private companies (loan brokers, banks, tech providers…) | ~20 | 0 | 0 |
| Municipalities | 1 | 0 | 0 |
| **TOTAL** | **107** | **0 valid replies** | **0 valid replies** |

### G) 1) D) 2). Probability analysis

Assuming a **very conservative** response probability of :

- 40% for courts,
- 30% for public authorities,
- 20% for political parties,
- 50% for media,
- 30% for corporations,

The probability of receiving **zero replies** to **107 independent registered letters** is statistically indistinguishable from **zero**.

The probability is:

$$P \approx (0.6 \times 0.7 \times 0.8 \times 0.5 \times 0.7)^{107} = 10^{-34}$$
*(less than 1 chance in 1 nonillion — impossible in the real world)*

## G) 1) D) 3). London Verification (critical evidence)

The Claimant physically travelled to London to verify filings.

Findings:

- **6 registered letters** were sent to the High Court.
- **Only 1 arrived — and it was an annex document**, unlinked to the main case.
- The 5 missing letters correspond **exactly** to core filings.

This is incompatible with logistical error.
It is consistent with **systemic interception**.

## G) 1) D) 4). Human impact — the informational bubble

The statistical findings confirm what the Claimant has lived subjectively for years:

**He has been isolated inside a fabricated administrative vacuum, where none of his communications reach their destination and none of the institutions he contacts even "exist" in practice.**

This is the essence of a **constructed informational bubble**, the hallmark of coordinated obstruction :

- No reply,
- No acknowledgment,
- No institution,
- No remedy,
- No allies.

This human reality reinforces — dramatically — the need for emergency judicial intervention.